UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| K. G.,<br><br>            Plaintiff,<br><br>      v.<br><br>MARTIN O'MALLEY,<br><br>            Defendant. | Case No.  23-cv-04017-VKD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR REVERSAL AND REMAND AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 11 |

Plaintiff K.G.[1] appeals from a final decision of the Commissioner of Social Security ("the Commissioner")[2] denying her application for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423 et seq.  K.G. contends that the administrative law judge (ALJ) erred by: (1) failing to properly consider K.G.'s subjective testimony regarding her physical limitations; (2) failing to accurately assess the severity of her mental impairments; (3) improperly disregarding her left shoulder impairments; (4) failing to identify her past relevant work as a composite position; and (5) failing to properly assess her residual functional capacity (RFC).  Dkt. No. 11 at 7–8.

---

[1] Because opinions by the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by her initials.  This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil L.R. 5-1(c)(5)(B)(i).

[2] Martin O'Malley, the current Commissioner of the Social Security Administration, is substituted for his predecessor pursuant to Federal Rule of Civil Procedure 25(d).

The parties have filed briefs respectively requesting the Court reverse or affirm the ALJ's decision. Dkt. Nos. 11, 13. The matter was submitted without oral argument. *See* Civil L.R. 7-1(b). Upon consideration of the papers and the relevant evidence of record, the Court grants in part and denies in part K.G.'s request for reversal of the ALJ's decision and remand for an award of benefits, grants in part and denies in part the Commissioner's cross-motion for summary judgment, and remands this matter for further administrative proceedings consistent with this order.[3]

## I.    BACKGROUND

K.G. filed an application for disability insurance benefits under Title II on March 24, 2021, when she was 51 years old, alleging that she has been disabled since February 17, 2021 due to multiple conditions, including: cervical spinal stenosis myelopathy, multiple severe neuro foraminal stenosis, multilevel spinal degenerative disc disease, multilevel spinal arthritis, disc osteophytes, fibromyalgia, and depression. AR 79, 234, 284.

K.G. attended high school through the 10th grade and has not obtained a GED. AR 27–28, 285. She has a history of severe cervical spine impairments and underwent spinal surgery in 2006. Dkt. No. 11 at 8 (citing AR 377). In 2016, K.G. suffered the traumatic loss of her daughter and her daughter's boyfriend in the Ghost Ship warehouse fire in Oakland, California. AR 353, 556. She most recently worked as a childcare attendant before her conditions caused her to stop in February 2021. AR 285–86.

K.G.'s application was denied initially and on reconsideration. AR 77, 93–94, 115, 126. An ALJ held a hearing on August 16, 2022 and subsequently issued an unfavorable decision on October 5, 2022. AR 96, 99, 206. The ALJ found that K.G. met the insured status requirements of the Act through December 31, 2021 and that she had not engaged in substantial gainful activity after her alleged onset date of February 17, 2021. AR 101. The ALJ found that K.G. had two severe impairments: degenerative disc disease and right shoulder degenerative joint disease. *Id.*

---

[3] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 3, 5.

United States District Court
Northern District of California

He also noted that she had been diagnosed with right wrist carpal tunnel syndrome, depression, anxiety, and PTSD, but concluded that these conditions were not severe.[4]  AR 102.  The ALJ noted that K.G.'s medical records mention a history of insomnia and left shoulder degenerative joint disease, but he found that these were not medically determinable impairments because the insomnia was "not substan[tiated] by clinical studies" and the existence of the left shoulder impairment was not established before December 31, 2021, K.G.'s date last insured.  AR 103. Finally, the ALJ concluded that K.G. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's regulations.  AR 104.

The ALJ determined that K.G. had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following limitations:

> [K.G. can] lift or carry occasionally 20 pounds, frequently 10; stand or walk about 6 hours of an 8-hour workday; sit about 6 hours of an 8-hour workday. Individual can push or pull consistent with the lifting and carrying just described. Can occasionally climb ladders, ropes, or scaffoldings, frequently stairs. Individual can frequently stoop, crouch, crawl, or kneel. With the right upper extremity, frequent overhead reaching, handling, and fingering.

Id.  Based on this assessment, the ALJ found that, through her date last insured, K.G. was able to perform her past relevant work as a childcare attendant, as actually and generally performed.  AR 110.  Accordingly, the ALJ concluded that K.G. was not disabled, as defined by the Act, from February 17, 2021, the alleged onset date, through December 31, 2021, the date last insured.  Id.

The Appeals Council denied K.G.'s request for review of the ALJ's decision.  AR 1.  K.G. then filed the present action seeking judicial review of the decision denying her application for benefits.  See Dkt. No. 1.

## II.    LEGAL STANDARD

This Court has the authority to review the Commissioner's decision to deny benefits

---

[4] K.G. was also diagnosed during the covered period with persistent complex bereavement disorder.  See Dkt. No. 11 at 18.  As discussed below, the ALJ did not reference this diagnosis as among the impairments he considered.

1   pursuant to 42 U.S.C. § 405(g).  The Commissioner's decision will be disturbed only if it is not

2   supported by substantial evidence or if it is based upon the application of improper legal

3   standards.  *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021); *Morgan v. Comm'r of Soc. Sec.*

4   *Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).  In this context, the term "substantial evidence" means

5   "more than a mere scintilla" but "less than a preponderance" and is "such relevant evidence as a

6   reasonable mind might accept as adequate to support a conclusion."  *Ahearn*, 988 F.3d at 1115

7   (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) and *Molina v. Astrue*, 674 F.3d 1104,

8   1110–11 (9th Cir. 2012), *superseded by regulation on other grounds*); *see also Morgan*, 169 F.3d

9   at 599.  When determining whether substantial evidence exists to support the Commissioner's

10  decision, the Court examines the administrative record as a whole, considering adverse as well as

11  supporting evidence.  *Ahearn*, 988 F.3d at 1115; *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir.

12  1989).  Where evidence exists to support more than one rational interpretation, the Court must

13  defer to the decision of the Commissioner.  *Ahearn*, 988 F.3d at 1115–16; *Morgan*, 169 F.3d at

14  599.

15  **III.    DISCUSSION**

16          "To determine whether a claimant is disabled, an ALJ is required to employ a five-step

17  sequential analysis, determining: (1) whether the claimant is doing substantial gainful activity; (2)

18  whether the claimant has a severe medically determinable physical or mental impairment or

19  combination of impairments that has lasted for more than 12 months; (3) whether the impairment

20  meets or equals one of the listings in the regulations; (4) whether, given the claimant's residual

21  functional capacity, the claimant can still do his or her past relevant work; and (5) whether the

22  claimant can make an adjustment to other work."  *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th

23  Cir. 2014) (citations and quotations omitted).  The claimant bears the burden of proof at "steps one

24  through four, but [the burden] shifts to the Commissioner at step five."  *Mercado v. Berryhill*, No.

25  16-cv-04200-BLF, 2017 WL 4029222, at *4 (N.D. Cal. Sept. 13, 2017) (quoting *Bray v. Comm'r*

26  *of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009)).

27          K.G. challenges several determinations made by the ALJ.  First, she argues that the ALJ

28  erred in discounting her subjective testimony about the severity of her pain symptoms and the

4

physical limitations associated with those symptoms.  Second, K.G. argues that the ALJ erred in assessing the severity of her mental impairments and failed entirely to consider her diagnosis of persistent complex bereavement disorder.  Third, she argues that the ALJ failed to properly consider her left shoulder impairment and erred in concluding that this impairment did not arise until after the date last insured.  Fourth, K.G. argues that the ALJ erred in categorizing her past relevant work as a nursery school attendant, described in the Dictionary of Occupational Titles (DOT).  Fifth, she argues that the ALJ's RFC assessment did not account for all of her relevant limitations.

### A.    Subjective Evidence Regarding Pain and Physical Limitations

K.G. argues that the ALJ improperly discounted her statements and testimony regarding her pain symptoms as inconsistent with objective medical evidence regarding her strength and mobility.  She argues that ALJ also improperly discounted her statements and testimony about her physical limitations as inconsistent with objective evidence of improvement, and as further inconsistent with her reported activities of daily living.  Dkt. No. 11 at 10–17.  The Commissioner counters that K.G. is merely presenting an "alternative interpretation of the facts" and that the ALJ's finding of unreliability was supported by clear evidence of "largely normal examination findings," pain relief from medication, and the ability to carry out "modest activities."  Dkt. No. 13 at 4–6.  The Court agrees with K.G.

In assessing a claimant's subjective testimony, an ALJ must conduct a two-step analysis.  First, "the claimant must produce objective medical evidence of an underlying impairment or impairments that could reasonably be expected to produce some degree of symptom."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quotations and citations omitted), *superseded by statute on other grounds*.  However, "the claimant is not required to show that [her] impairment could reasonably be expected to cause the severity of the symptom [she has] alleged," and "is not required to produce objective medical evidence of the pain or fatigue itself, or the severity thereof."  *Ferguson v. O'Malley*, 95 F.4th 1194, 1199 (9th Cir. 2024) (citations and quotations omitted).  If the claimant provides sufficient support, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of her symptoms

"only by offering specific, clear and convincing reasons for doing so." *Tommasetti*, 533 F.3d at 1039 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)). That is, the ALJ must make an assessment "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Id.*

Here, in a self-reported function report dated April 2021, K.G. described several physical limitations due to pain. AR 290. She reported that she could not "move [her] head: up, down, left or right." *Id.* She could not sit longer than 20 minutes without experiencing neck pain and could not stand or walk more than 20 to 25 minutes without experiencing lower back pain. *Id.* Her right shoulder blade hurt, particularly when she took a deep breath, sneezed, or coughed. *Id.* She could take her dog for short walks but only to the end of her building. AR 291. She could microwave meals and separate the clothes for the laundry but was not able to perform many other household chores. AR 292. She did not drive more than three to five miles and if she needed to travel farther, her husband drove. AR 293–94.

At the hearing on August 16, 2022, K.G. testified that she suffers from a "heavy painful sensation" in her neck and "feels like [her] head is a watermelon and [her] neck is a popsicle stick." AR 33. She experiences pain whether she turns her head or holds it still. AR 33–34. She testified that the pain extends beyond her neck and radiates to her shoulders. AR 34. She experiences sharp pain in her right shoulder when reaching to the front or the sides. AR 35. She noted that she keeps her arm pressed close to her body which helps a little. *Id.* She testified that she can reach and hold a gallon of water or milk with two hands but that it is painful to do so. *Id.* She said she can make toast but her husband does much of the cooking and the shopping for large items. AR 35–36. She said she can take her small dog out for a walk for about five minutes at a time. AR 30, 39. She said she is not able to lift the 10-pound container of dog food; her husband lifts it, and she then scoops the food out. AR 31. She does not lift from the ground at all. AR 36. She testified that she drives to the store located across the street from her house because it is too painful to walk that distance. AR 29. Her pain prevents her from looking at her phone for more than five minutes at a time. AR 32.

"When objective medical evidence in the record is *inconsistent* with the claimant's

subjective testimony, the ALJ may indeed weigh it as undercutting such testimony." *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022) (emphasis in original). The ALJ found that K.G.'s "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 106. However, he also found that her statements concerning "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* Because the ALJ did not identify any affirmative evidence of malingering, he was required to provide specific, clear, and convincing reasons for this determination. *Tommasetti*, 533 F.3d at 1039.

### 1. Medical Evidence

The ALJ found that K.G.'s asserted limitations were not consistent with her medical records or supported by physical examination findings. AR 107. Specifically, the ALJ observed that the records reflect K.G.'s gait and balance were normal. *Id.* He also referred to the following findings: K.G.'s left upper arm strength was normal (5/5); her right upper arm strength was somewhat less than normal (5-/5); and her right hand grip strength was below normal (4/5). *Id.* No signs of focal weakness were observed, and other tests for shoulder joint problems and disc herniation were negative. *Id.* Another test for sensation to light touch was also normal. *Id.*

Because the ALJ cited generally to several multi-page exhibits, without indicating specifically the evidence on which he relied—i.e., Exhibit 1F (103 pages), Exhibit 2F (45 pages), Exhibit 3F (30 pages)—review of his findings is difficult. As best the Court can discern, the ALJ principally relied on an assessment made by a pain management specialist on February 24, 2021, as well as a subsequent assessment on March 17, 2021 made at the time K.G. received a spinal steroid injection. *See* AR 371, 378. In addition, the Commissioner calls the Court's attention to records of a video medical consult on June 16, 2021.[5] Dkt. No. 13 at 4. However, as the

---

[5] The Commissioner appears to mischaracterize the results from the June 16, 2021 video visit. AR 475. According to the Commissioner, this record reflects that K.G. "den[ied] any problems with ambulatory or sitting endurance." Dkt. No. 13 at 4. However, the record indicates only that next to "ambulatory endurance" and "sitting endurance," the provider marked "NA." AR 475. By contrast, as to other factors evaluated on the same visit, the provider marked "denied." *Id.* ("Bowel/bladder: Denies spontaneous loss of bowel or bladder control") ("denies recent headaches, changes in vision"). Without more, the record does not support the Commissioner's construction of "NA" to mean "denied."

referenced observations from this video consult do not appear in the ALJ's decision, there is no clear indication in the ALJ's decision that the ALJ relied on these records for his determination that K.G.'s statements were not consistent with the medical evidence.  The Court is "constrained to review the reasons the ALJ asserts" and it would be "error for the [Court] to affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss."  *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003); *see also A.P. v. Kijakazi*, No. 23-cv-01184-EMC, 2024 WL 116307, at *9 (N.D. Cal. Jan. 10, 2024) ("As the ALJ did not discuss these aspects of the record in her decision, they are not properly considered here as a basis to uphold the credibility determination.").

K.G. argues that the medical evidence on which the ALJ relied does not contradict her testimony regarding the limiting nature of her pain symptoms and the lack of meaningful improvement of those symptoms with treatment.  Dkt. No. 11 at 10–12.  The Court agrees that, setting aside the question of improvement (addressed further below), the medical evidence on which the ALJ relied does not support his finding that K.G.'s statements and testimony are inconsistent with the overall record.  For example, findings of normal gait and balance are not inconsistent with K.G.'s assertions that her pain limits the duration and distance she is able to walk.  Similarly, normal (or mostly normal) arm muscle strength and hand grip strength are not inconsistent with K.G.'s assertions that pain limits her ability to lift and carry heavy objects, even if her muscle and grip strength is substantially normal.  Moreover, in assessing the consistency of K.G.'s subjective statements and testimony, the ALJ appears to have focused on examinations conducted early in the alleged disability period without considering examinations that occurred later, and which, as discussed below, reflect changes in K.G.'s symptoms and limitations over time.

In the absence of a more specific indication of which findings the ALJ deemed inconsistent with K.G.'s subjective testimony, the Court concludes that the ALJ's determination that her testimony was not entirely consistent with the medical evidence, and should be discounted on that basis, is not supported by substantial evidence or by specific, clear, and convincing reasons.

## 2.    Evidence of Improvement

The ALJ found that K.G.'s asserted limitations due to pain were not consistent with medical records showing that her symptoms improved with treatment.  AR 107.  Specifically, the ALJ stated:

> Treatment records reveal the claimant advised provider that Gabapentin provided some relief, made the pain more bearable, and decreased her neck pain (Ex. 1F/14; 4F/16; 5F/19, 73, 193).  She stated the neck injection helped.  After the shoulder injection, the pain improved 80% and the right arm numbness/tingling dissipated (Ex. 3F/17; 5F/192).  Following the hydrodilation, the claimant reported better motion and on and off pain rather than constant (Ex. 5F/133).  In addition, providers noted that the claimant improved with ongoing [physical therapy] (Ex. 4F/6).
> . . .
>
> Providers noted in September 2021 that the claimant demonstrated improved cervical and lumbar range of motion (Ex. 5F).

AR 107.  "Improvement with treatment is an appropriate consideration in assessing subjective symptoms."  *Crystal L. v. Kijakazi*, No. 22-cv-05180-TSH, 2023 WL 8101916, at *7 (N.D. Cal. Nov. 21, 2023).  However, "the examples an ALJ chooses 'must *in fact* constitute examples of a broader development.'"  *Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1018 (9th Cir. 2014)) (emphasis in original).

K.G. contends that she had surgery, physical therapy, steroid injections, and medication for her neck and shoulder issues but that they did not give lasting relief.  AR 37–39.  She argues that the ALJ "cherry-picked" a few statements from her records that refer to improvements while ignoring other parts of the record reflecting the limited nature and duration of the improvements.  Dkt. No. 11 at 10–15.  The Court agrees with K.G.

With respect to treatment using gabapentin, the ALJ correctly observed that the medication provided K.G. with some pain relief.  *See* AR 378 (2/24/21 – "For her pain, she has tried Gabapentin (just started) with some relief"); AR 558 (9/7/21 – "Gabapentin 3x/day (mild relief, but makes her drowsy so she tries not to take it)"); AR 591 (9/29/21 – "The gabapentin helps the pain be more bearable."); AR 645 (11/17/21 – "[K.G.] has found the gabapentin helpful for decreasing her neck pain. She will have that medication continued.").  However, records

1    indicating that gabapentin provided "mild relief" and helped the "pain be more bearable" are not

2    inconsistent with K.G.'s testimony that this treatment did not provide "extended" or "long-term"

3    relief.  AR 37–38; *see also* AR 634 (11/2/21 – "Taking gabapentin for neck, does not help

4    shoulder at all.").  Further, the ALJ appears not to have considered how the side effects of these

5    medications, noted throughout the records, might impact K.G.'s ability to work.  *See* AR 491

6    (4/9/21 – "Gabapentin caused 'fogginess' and cannot take more"); AR 577 (9/20/21 – "She

7    continues to take Gabapentin if she stays at home. Does not take it if she goes out to run

8    errands."); AR 591 (9/29/21 – "[Gabapentin] makes her too dizzy to drive so she doesn't take it if

9    she goes out").

10          With respect to treatment based on steroid injections, the ALJ correctly noted that some of

11   K.G.'s pain symptoms improved after treatment.  *See* AR 529 (8/6/21 – "Her shoulder pain has

12   also improved 80% since the injection.  However, she continues to feel weakness in her arm and

13   feels she cannot carry things. She feels off and on pain that goes from the base of her skull toward

14   her shoulder and shoulder blade."); AR 764 (12/28/21 – "She has had 4-5 injections in her

15   shoulder that didn't help. She wonders if a neck injection would help. She found that a neck

16   injection did help when she got one this year. The shoulder pain is the worse[sic], then her neck is

17   second.").  However, the ALJ did not acknowledge that the results of the injections were, at best,

18   mixed, reflecting that K.G. experienced *transient* relief for *some* of her pain—a pattern that

19   remained consistent during the period covered by the treatment notes in the record.  *See e.g.*, AR

20   558 (9/7/21 – "Had SA and AC injection on 7/16 with mild relief. However, patient saw Dr.

21   Watson last week who now thinks she has frozen shoulder. Scheduled for injection next

22   Monday."); AR 561 (9/3/21 – "injections helped transiently but pain back"); AR 577 (9/20/21 –

23   "Got an injection to the right shoulder with mild relief, although still reports R clavicle pain and

24   neck pain"); AR 591 (9/29/21 – neck getting worse "as if the cortisone shot is wearing off"); AR

25   617 (10/12/21 – "She feels like the cortisone injection for the shoulder is wearing off."); AR 634

26   (11/2/21 – "Today pt reports GH injection did not help, pain getting worse"); AR 640–41 (11/4/21

27   – "pt got GH injection in mid Sept with only about one wk of relief, feels pain worse than ever");

28   AR 644 (11/17/21 – "She has had 3 sets of steroid injections in her shoulder without relief"); AR

United States District Court
Northern District of California

801 (1/26/22 – "Today pt reports: c spine injection initiall[y] took away ALL right shoulder pain, was good for about 1.5 days now shoulder pain coming back"); AR 833 (3/1/2022 – "The injection in the neck helped the neck but the right shoulder pain is the worst. Just from lifting her arm a little bit or across her torso. She has a shoulder cortisone injection 4-5 times, the injections only last one day.").  Indeed, at least one treatment note suggests that K.G.'s provider recommended hydrodilation treatment, in part, because steroid injections did not provide adequate pain relief.  AR 661 (11/17/2021 – "right frozen shoulder, not progressing, spoke with Dr Summerville who agrees to do hydrodilation procedure tomorrow . . . . Has not had good relief with cortisone to joint and is not progressing on ROM. Pain still quite severe.").

With respect to physical therapy, the ALJ correctly cited improvements K.G. experienced from this treatment.  *See* AR 107 (citing AR 548 (9/14/21 – "slow improvement with ongoing PT")).  However, in assessing the efficacy of physical therapy, the ALJ appears not to have taken into account the rather limited goals against which K.G.'s improvements were measured, such as sitting or walking for 15 minutes at a time, or that she struggled to engage in physical therapy because it increased her pain.  *See* AR 577 ("Patient will be able to tolerate sitting for 15 minutes without increase in symptoms within 12 weeks. // Current Status as of 9/20/2021: Progressing slowly towards functional goal, still limited by R sided neck, upper back pain and L low back pain"); *id.* ("Patient will be able to tolerate walking for 15 minutes without increase in symptoms within 12 weeks. // Current Status as of 9/20/2021: Progressing slowly towards function goal, still limited by L low back pain."); AR 591 (9/29/2021 – "It got to 8-9 at physical therapy during the first visit. She has been feeling somewhat better."); AR 617 (10/12/2021 – "She has been trying to do the exercises but sometimes they cause more pain.").  The ALJ also observed that K.G.'s physical therapy providers reported improvement in her cervical and lumbar range of motion in September 2021.  AR 107.  In support of this observation, he cited generally to a 390-page exhibit (5F) without identifying any specific record.  *Id.*  The Court has identified a record within this exhibit from a physical therapy clinic indicating K.G. experienced some improvement in her range of motion in September 2021.  *See* AR 578 ("improved C/S and L/S ROM compared to last visit, although still limited by pain and stiffness. Very tender to palpation in the R neck/upper back.

Limited tolerance to manual therapy.")  However, one month later, the same clinic reported: "continues to present with decreased C/S and R shoulder ROM, decreased muscle flexibility, limited tolerance to manual therapy."  AR 618.  In short, the record evidence on which the ALJ relied does not support his determination that physical therapy produced sustained improvements that are inconsistent with K.G.'s testimony about her pain symptoms.

With respect to hydrodilation treatment, the ALJ correctly noted that K.G. received some relief from this treatment in November 2021, approximately one month before her date last insured.  *See* AR 704 (12/1/21 – "reports motion and pain somewhat better after hydrodilation. Still gets pain at night and with sudden movements, once she does sudden movement then repeats the second time is better."); AR 705 (12/1/21 – "better motion, pain off and on rather than constant").  However, the record as a whole does not support the ALJ's conclusion that hydrodilation, alone or together with K.G.'s other treatments, provided sustained relief inconsistent with her subjective statements about her symptoms, as opposed to intermittent relief.

Rather than demonstrating a broad trend toward improvement and relief, the record indicates a cycle of mild or partial improvement, followed by a return of pain symptoms.  This evidence is not inconsistent with K.G.'s testimony.  The ALJ's contrary conclusion is not supported by substantial evidence or by specific, clear, and convincing reasons.

### 3.   Report of Daily Activities

The ALJ additionally relied on an assessment of K.G.'s reported daily activities in discounting her subjective symptom testimony.  Specifically, the ALJ determined that K.G. "is more capable than asserted" because she ran errands, went to Hawaii for her son's wedding, and had a number of hobbies, such as "hiking, travel, [and] photography."  AR 107.  K.G. argues that the ALJ did not specifically explain how her travel and alleged hobbies contradicted her testimony or "how they related in any way to the ability to sustain full-time competitive employment, particularly in a nursery school."  Dkt. No. 11 at 15-17.  She further observes that the ALJ failed to ask any questions or gather further information on these activities at the hearing.  *Id.* at 16.

"An ALJ may properly come to an adverse credibility determination as to subjective pain testimony based upon activities of daily living where: (1) the activities of daily living contradict

United States District Court
Northern District of California

the claimant's other testimony; and/or (2) the activities of daily living meet the threshold for transferable work skills." *A.P.*, 2024 WL 116307, at *9. However, "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016; *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Several courts, including this one, have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.").

In support of his assertion that K.G. ran errands, the ALJ cited to one reference where a provider notes that K.G. does not take gabapentin "if she goes out to run errands." AR 577. The record does not indicate the nature or difficulty of the errands. In her April 2021 function report, K.G. described running errands to Safeway and Walgreens, stores which she says are located across the street from her home. AR 294. She stated that if the distance is farther than that, her husband drives. *Id.* It is not clear from the ALJ's decision how the fact that K.G. could run errands contradicts her symptom testimony. The ALJ also cited record evidence indicating that K.G. traveled to Hawaii to attend her son's wedding. AR 107 (citing AR 644). Nothing in the record indicates what such travel entailed, and the ALJ did not explain how the mere fact of K.G.'s travel and attendance at the wedding was inconsistent with her testimony. The ALJ did not inquire into this travel at the hearing and did nothing else to develop the record on this point. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("The ALJ in a social security case has an independent duty to fully and fairly develop the record . . . . Ambiguous evidence  . . . triggers the ALJ's duty to conduct an appropriate inquiry.") (quotations and citations omitted).

With regard to K.G.'s hobbies, the ALJ cited generally to several exhibits in the record without providing specific citations. K.G. argues that many of the referenced hobbies are activities that she used to do but no longer can because of her pain. Dkt. No. 11 at 15–17; *see also* AR 294 (no longer can engage in hobbies because "in too much pain and medicine makes [her] to[o] groggy"). Because the ALJ cited generally to several multi-page exhibits, without indicating specifically the evidence on which he relied, review of his findings on this point is difficult. As

best the Court can discern, most references to K.G.'s hobbies appear in the context of her "social history" recorded during medical assessments. *See, e.g.*, AR 382, 384, 473, 485, 492, 548, 746, 945. These same records, which refer to her hobbies in the present tense, also report that she "works in daycare," although at the time of each assessment K.G. was no longer working. *Id.* This calls into question the accuracy of an inference that the assessments refer to K.G.'s current, as opposed to past, hobbies. Because the ALJ did not specifically identify record evidence indicating that K.G. engaged in hobbies during the time of her claimed disability, and did not explain how any such hobbies are inconsistent with her symptom testimony, the Court finds insubstantial support for the ALJ's conclusion that K.G. engaged in these hobbies during the insured period.

On the record presented, the ALJ's determination that K.G.'s daily activities contradict her subjective testimony is not supported by substantial evidence or by specific, clear, and convincing reasons.

### 4. Consideration of Post-DLI Treatment

K.G. argues that the ALJ erred in treating the end of the insured period "as though it were a steel curtain" that "prevented him from considering medical evidence and treatment" after the date last insured. Dkt. No. 11 at 13–14. Specifically, she points to the ALJ's failure to consider evidence of "continu[ing] treatment" for her right shoulder after December 31, 2021, citing "regulations [that] require that a claimant must establish disability on or before the date last insured in order to be entitled to a period of disability and disability insurance benefits." AR 107. The Commissioner does not specifically address K.G.'s arguments about evidence of her right shoulder surgery, although elsewhere he argues that, to the extent Ninth Circuit precedent supports consideration of post-DLI evidence, such consideration is limited to post-DLI medical opinions, not other forms of evidence. Dkt. No. 13 at 9 (citing *Taylor v. Comm'r of Soc. Sec. Admin.,* 659 F.3d 1228, 1232 (9th Cir. 2011)). The Court agrees that the ALJ should have considered K.G.'s right shoulder surgery evidence, or at least explained why it was not relevant in his analysis of the intensity, persistence, and limiting effect of her symptoms.

While K.G. is required to establish she had a disability prior to the end of the covered

14

period, "post-DLI evidence" may be relevant to that determination, and neither *Taylor*, nor the precedent it relies on, holds that relevant evidence is limited to formal medical opinions. *See, e.g.*, *Taylor*, 659 F.3d at 1232 ("[T]his court has specifically held that medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the [pre-expiration condition].") (quoting *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995), *as amended* (Apr. 9, 1996)); *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988) ("There is considerable authority in the Eighth, Eleventh, Fourth, Second and Seventh Circuits that supports our conclusion, that medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition.") (citing cases supporting consideration of different forms of evidence post-DLI); *see also F.B. v. Kijakazi*, No. 21-cv-01628-JCS, 2022 WL 4544202, at *9 (N.D. Cal. Sept. 28, 2022) ("Accordingly, the post-DLI medical evidence *and* opinions were relevant to the ALJ's decision . . . .") (emphasis added); *Paula W. v. Kijakazi*, No. 21-cv-04092-DMR, 2022 WL 2439178, at *3 (N.D. Cal. July 5, 2022) ("ALJ appropriately recognized that the post-DLI evidence, which pertained to Plaintiff's 'pre-expiration condition[s],' was nevertheless relevant and required consideration on the merits.") (citing *Lester*, 81 F.3d at 832 and *Taylor*, 659 F.3d at 1232); *Willig v. Berryhill*, No. 16-cv-03041-MEJ, 2017 WL 2021369, at *5 (N.D. Cal. May 12, 2017) ("The fact the examination took place after the DLI does not necessarily render the examination irrelevant.").

Here, K.G. points specifically to a surgery on her right shoulder in March of 2022, nine weeks after her date last insured.  Dkt. No. 11 at 9, 13; *see also* AR 840 (3/2/22 – "Also offer AC dx injection as this can cause referred ant pain. She is agreeable to try this tomorrow before last stop which is surgery.").  Given that one of the ALJ's findings was a severe impairment to her right shoulder, this surgery is reasonably relevant to her disability during the time period and the ALJ erred in not considering this in his assessment and/or not explaining why it was not relevant to her pre-expiration right shoulder condition.

\* \* \*

For the foregoing reasons, the Court concludes that the ALJ erred in discounting K.G's testimony because he did not give specific, clear, and convincing reasons to do so.  The Court thus

1   grants K.G.'s request for relief regarding the ALJ's assessment of her subjective testimony, and

2   denies the Commissioner's cross-motion on this issue.

3       **B.      Mental Impairments**

4           K.G. challenges the ALJ's determination that her mental health conditions were not severe

5   and his subsequent decision to not include any limitations related to her mental health in assessing

6   her RFC.  Dkt. No. 11 at 17.  Specifically, she argues that the ALJ failed to address one of her

7   diagnosed conditions, relied on cherry-picked selections from the record, and improperly gave

8   weight to a state agency mental health consultant's opinion.  *Id.* at 18–19.  The Commissioner

9   argues that K.G. simply presents an "alternative interpretation" of the evidence and does not show

10  that the ALJ's determination is not supported by the evidence.  Dkt. No. 13 at 7–8.

11          At step two of the sequential analysis, the ALJ found that K.G. had medically determinable

12  impairments of depression, anxiety, and PTSD, but concluded that these conditions were not

13  severe because she had no limitations in the four broad areas of mental functioning described in

14  the regulations for evaluating mental impairments, known as the "paragraph B" criteria: (1)

15  understanding, remembering, or applying information; (2) interacting with others; (3)

16  concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  AR 102–03;

17  *see also* 20 C.F.R. § 404.1520a(c)(3) (citing 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2,

18  § 12.00E).  An impairment or combination of impairments is considered "severe" if it

19  "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20

20  C.F.R. § 404.1520(c).

21          "When determining the claimant's RFC, the ALJ must consider limitations and restrictions

22  imposed by all of the claimant's impairments, whether or not they are severe."  *Mercado*, 2017

23  WL 4029222, at *5.  The RFC determination requires a more specific and detailed assessment of a

24  claimant's mental impairments than is required at step two.  *See* AR 103 ("The mental residual

25  functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a

26  more detailed assessment."); *see also* SSR 96-8p, 1996 WL 374184, at *4 ("The mental RFC

27  assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed

28  assessment by itemizing various functions contained in the broad categories found in paragraphs B

United States District Court
Northern District of California

16

1   and C of the adult mental disorders listings . . . .").

2   **1.      Bereavement Disorder Diagnosis**

3   K.G.'s primary argument is that the ALJ erred in failing to consider, for any purpose, her

4   diagnosis of persistent complex bereavement disorder.  Dkt. No. 11 at 18.  The Commissioner

5   concedes that the ALJ did not consider this diagnosis but argues that such an omission is harmless

6   because the ALJ considered "all of [K.G.]'s symptom allegations," including bereavement.  Dkt.

7   No. 13 at 8.  The Court agrees with K.G. that the ALJ's failure to consider her bereavement

8   disorder diagnosis was an error, and that it was not harmless.

9   The ALJ's decision reflects that after completing step two of the sequential analysis and

10   find no mental limitations, the ALJ applied this no-limitation finding directly to his assessment of

11   K.G.'s RFC.  *See* AR 103 ("The following residual functional capacity assessment reflects the

12   degree of limitation I have found in the 'paragraph B' mental function analysis.");  AR 109

13   (referring to the step two analysis of the mental health impairments to support finding physician's

14   opinion persuasive in RFC calculation).  While the Commissioner is correct that the ALJ

15   mentioned K.G.'s grief from the loss of her daughter, the decision does not reflect that the ALJ

16   considered the diagnosed mental health condition—persistent complex bereavement disorder—

17   associated with this loss.  AR 102 ("On August 25, 2021, she reported that she was also grieving

18   for her daughter who died in the December 2016 Ghost Ship fire.");  *see also* AR 108 (citing

19   diagnosis of bereavement disorder as among list of diagnoses by treating physician).

20   Classification of a mental health impairment as severe or not severe will not necessarily impact an

21   RFC assessment, *see Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017), but a failure to

22   consider an impairment at all is not harmless.  *Mercado*, 2017 WL 4029222, at *5.

23   Here, K.G.'s bereavement disorder is central to her claim that she was no longer able to

24   work with children, which is a requirement of her past relevant work.  There is no indication in the

25   record that the ALJ's consideration of K.G.'s other mental health conditions—i.e., depression,

26   anxiety, and PTSD—are coextensive with or subsume her bereavement disorder, or that

27   bereavement disorder is no different than experiencing grief following a loss.  For this reason, the

28   Court concludes that the ALJ erred in failing to consider K.G.'s bereavement disorder at step two

United States District Court
Northern District of California

1   and in formulating her RFC, and remand on this ground alone is necessary.

2                   **2.      Subjective Evidence Regarding Mental Health Symptoms**

3          K.G. argues that the ALJ discounted her statements and testimony about her mental

4   impairments by cherry-picking contrary evidence from the record.  Dkt. No. 11 at 18–20.  K.G.

5   does not clearly identify which of the ALJ's findings she challenges with respect to the ALJ's

6   paragraph B analysis.  However, her arguments are directed principally to the ALJ's failure to find

7   that she had limitations in "social function in a competitive work environment."  *See* Dkt. No. 11

8   at 20.  Thus, the Court understands that K.G. principally challenges the ALJ's finding that she had

9   no limitation in the second mental functional area—i.e. her ability to interact with others—and that

10  her limitations in this area should have been included in the RFC assessment.

11         The ALJ's decision indicates that he found K.G.'s "medically determinable impairments"

12  could cause the symptoms she described and identifies no evidence of malingering.  AR 106.

13  Thus, to the extent the ALJ discounted K.G.'s statements, he was required to specifically cite clear

14  and convincing reasons.  *See Tommasetti*, 533 F.3d at 1039.  In all other aspects, his conclusions

15  must be supported by substantial evidence.  *See Ahearn*, 988 F.3d at 1115.

16         In the mental health context, "[c]ycles of improvement and debilitating symptoms are a

17  common occurrence, and in such circumstances, it is error for an ALJ to pick out a few isolated

18  instances of improvement over a period of months or years and to treat them as a basis for

19  concluding a claimant is capable of working."  *Garrison*, 759 F.3d at 1017.  Moreover, reports of

20  improvement must be examined in context—a relative improvement in a claimant's symptoms

21  may not mean they are no longer disabled.  *See Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th

22  Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes

23  some improvement does not mean that the person's impairments no longer seriously affect her

24  ability to function in a workplace.").

25         The ALJ determined that K.G. had no limitations in interacting with others primarily

26  because (1) "she was able to talk to her sister-in-law about her daughter"; (2) "she reported having

27  no problems getting along with others" and spent time with others, virtually and in person; and (3)

28  her mood improved with treatment, particularly in December 2021.  AR 102–03.

United States District Court
Northern District of California

1    While the ALJ does not explain how K.G's private conversations with a close relative (her

2 sister-in-law) support a finding that she has no limitations in interacting with others in a work

3 setting, the Commissioner is correct that the record contains evidence, including K.G.'s own

4 statements, that support a finding that K.G. retained the capacity to interact with others in

5 circumstances that bear on her ability to perform her past relevant work. [6] *See* AR 294–295

6 (indicating K.G. spends time with friends and family through phone calls, video calls, texts, or in

7 person; does not have any problems getting along with others; does not have problems with

8 authority figures and has never been laid off because of issues getting along with others.).  Further,

9 the ALJ correctly noted that records indicate K.G.'s mood improved with treatment and

10 medication, particularly around December 2021.  *See, e.g.,* AR 595 (9/29/2021 – "Her minipress

11 and Prozac are working. Her mood is better."); AR 710 (12/1/21 – "[She] continues to be tearful,

12 but her mood is considerabl[y] better and less depressed."); AR 711 (12/1/21 – "[Her] nightmares

13 have stopped.").  However, the record also includes treatment notes indicating some periods of

14 regression and fluctuation between "mild" and "moderate," especially towards the end of the

15 insured period.  *See, e.g.,* AR 522 (8/24/21 – PHQ score, a metric for measuring depression, was

16 at 21 (severe)); AR 601 (9/29/21 – PHQ score of 9 (mild)); AR 648 (11/17/21 – PHQ score of 17

17 (moderately severe)); AR 713 (12/1/21 – PHQ score of 12 (moderate)); AR 766 (12/28/2021 –

18 PHQ score of 10 (moderate)).  Measures of K.G.'s anxiety also showed fluctuations but indicated

19 a trend of improvement.  *See* AR 522 (8/24/2021 – GAD score of 15 (severe)); AR 587 (9/7/2021

20 – GAD score of 16 (severe)); AR 593 (9/29/2021 – GAD score of 15 (severe)); AR 648

21 (11/17/2021 – GAD score of 12 (moderate)); AR 717 (12/1/2021 – GAD score of 8 (mild)); AR

22 768 (12/28/2021 – GAD score of 7 (mild)).  In addition, measurements of K.G.'s ability to

23 "manage[] day-to-day life" were reported as "very poorly" or "fairly poorly" throughout the

24

25 ───────────────

26 [6] In discussing the paragraph B criteria, the ALJ again cited generally to multi-page exhibits in the record, making it difficult to identify the specific evidence on which he relied.  *See* AR 103 (citing 5E (8 pages), 3F (30 pages), 4F (30 pages), and 5F (390 pages)).  The Court further notes that the

27 paragraph addressing the functional area of interactions with others contained an unfinished sentence beginning "Records reveal . . .," AR 102, suggesting the ALJ did not identify all of the

28 evidence on which he relied.

record of her psychiatric visits.  *See* AR 587, 648, 713, 761.

K.G. does not deny that medication provided her with some relief.  AR 43.  Nor does she assert that her mental health conditions did not improve through treatment.  Dkt No. 11 at 20. Instead, she argues that the help from such treatments was only "modest" and that the ALJ should have considered this modest help "compared to the ongoing mental impairments" K.G. suffered. *Id.*  However, apart from the failure to consider her bereavement disorder diagnosis, K.G. does not identify the specific mental impairments or limitations she contends remained following the acknowledged improvements in her conditions or how the ALJ erred in assessing those impairments and limitations at step two or as part of her RFC.  Rather, given the undisputed evidence of improvement regarding her conditions of depression and anxiety, the ALJ's findings are supported by substantial evidence, and as to those conditions, the ALJ provided specific, clear, and convincing reasons for discounting K.G.'s testimony regarding the severity of her symptoms.

In sum, the record contains evidence of K.G.'s improvements over time with respect to certain aspects of her mental health, and the Court is not persuaded that the ALJ erred in his assessment that at least some of K.G.'s mental health impairments improved with treatment.

### 3.    Assessment of Consultant Medical Opinion

K.G. challenges the ALJ's adoption of the opinion of Dr. N. Genece, a state agency mental health consultant.  Dkt. No. 11 at 18.  The Commissioner does not address this argument.

The ALJ must evaluate the "persuasiveness" of all medical opinions in the record based on: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  20 C.F.R. § 404.1520c.  The ALJ is required to explicitly address factors (1) and (2) in his or her decision but is not required to explain how he or she considered the remaining three factors listed in the regulations.  *Id.* § 404.1520c(b)(2); *see Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022).

In accepting Dr. Genece's findings, the ALJ stated that the opinion is persuasive "because it is supported by the overall record, which reveals generally unremarkable mental status

examination findings and improvement with medication, as discussed above in Finding 3." AR 109. K.G. argues that Dr. Genece did not have access to any of K.G.'s medical records after September 17, 2021 and that Dr. Genece did not assess the case under "trauma and stress related disorders" but only "anxiety and depressive disorders." Dkt. No. 11 at 18. K.G. does not explain how assessing K.G.'s records under these different categories would have or should have impacted Dr. Genece's opinion. Moreover, Dr. Genece reviewed the records that were available at the time of her assessment, and there is no reason the ALJ must discount the opinion as not adequately supported or as inconsistent simply because other records were generated at a later time.

The Court concludes that K.G. has not identified any errors in the ALJ's assessment of Dr. Genece's opinion.

***

For the foregoing reasons, the Court concludes that the ALJ erred in failing to consider K.G.'s diagnosis of persistent complex bereavement disorder, both at step two and in formulating her RFC. The Court therefore grants K.G.'s request for relief as to this issue but denies it as to her remaining challenges to the ALJ's mental health analysis. The Court denies the Commissioner's cross-motion as to the ALJ's consideration of K.G.'s bereavement disorder but grants it in all other respects relating to the ALJ's mental health analysis.

### C.    Left Shoulder Impairment

K.G. argues that the ALJ erred in determining that her left shoulder degenerative joint disease was not established until after her date last insured. Dkt. No. 11 at 20–22. Specifically, she argues that the ALJ mischaracterized her testimony in saying that she only began to have pain in her left shoulder after December 31, 2021, and that he erred in not finding her left shoulder condition was a severe impairment that was established before her date last insured. *Id.* at 21. The Commissioner contends that the record indicates K.G. "remained silent" as to any left shoulder pain during the insured period and furthers argues that the type of evidence she offers to support her left shoulder impairment is not appropriate for consideration post-DLI.[7] Dkt. No. 13

---

[7] The Court addresses the Commissioner's legal argument regarding post-DLI evidence in section III.A.4 *supra*.

United States District Court
Northern District of California

at 9.

At the August 16, 2022 hearing, K.G. testified that she began experiencing pain in her left shoulder in approximately August of 2021.  AR 37.  She acknowledged that her left shoulder pain was not as severe as her right shoulder or her neck pain.  *Id.*  Treatment records from September 3, 2021 indicate she reported "starting to get similar shooting pains to the left side [shoulder]."  AR 561.  However, K.G. did not receive imaging on her left shoulder until June of 2022, and she does not appear to have requested examination or treatment prior to that date.  AR 1125 (messaging her doctor "if you can look at my left should[sic] I'm having the same pain as the beginning if[sic] the right. can I make an appt for left shoulder?"); 1146 (confirmation of left shoulder imaging).  Imaging conducted in June 2022 revealed "severe AC joint arthritis on the left side."  AR 1181.  K.G. does not explain why these findings necessarily require the conclusion that K.G. suffered a severe impairment of her left shoulder no later than December 31, 2021.

Where there are multiple rational explanations supported by substantial evidence, the Court must defer to the ALJ.  *Ahearn*, 988 F.3d at 1115–16.  While the record reflects that K.G. mentioned left shoulder pain to her providers before her date last insured, and that subsequent medical evidence dated six months after the date last insured revealed a "severe" condition, substantial evidence supports the ALJ's conclusion that K.G.'s left shoulder impairment did not become a severe impairment or an impairment that was required to have been considered as part of the RFC, during the relevant period from February 17, 2021 through December 31, 2021.

The Court therefore grants the Commissioner's cross-motion and affirms the ALJ's finding regarding K.G.'s left shoulder impairment.  The Court denies K.G.'s request for relief as to this issue.

### D.    Categorization of Past Work

K.G. argues that the ALJ failed to recognize that her past work as a childcare attendant was a composite job, with requirements in addition to those stated for nursery school attendant (359.677-018)[8] in the DOT.  Dkt. No. 11 at 22–23.  The Commissioner argues that K.G.'s "lay

---

[8] The DOT classifies nursery school attendant as an individual who: "Organizes and leads activities of prekindergarten children in nursery schools or in playrooms operated for patrons of

United States District Court
Northern District of California

1   speculation is insufficient to overturn the ALJ's finding, which was based on the testimony of a

2   vocational expert."  Dkt. No. 13 at 11.

3          At step four of the sequential analysis, the claimant "has the burden of showing that she

4   could no longer perform her past work."  *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir. 2002).

5   The ALJ must consider whether the claimant can perform the work as actually performed or as it

6   is generally performed in the national economy.  SSR 24-2p, 89 Fed. Reg. 48479 (June 22, 2024).

7   An individual is not disabled "[i]f the individual cannot meet the functional demands actually

8   required in the former job but *can* meet the functional demands as generally required throughout

9   the economy."  *Id.* (emphasis added).  However, "when a claimant's past relevant work is a

10  composite of two or more separate occupations, he or she does not have past relevant work as

11  generally performed in the national economy."  *Jones v. Colvin*, No. 14-cv-05260-EMC, 2015 WL

12  5964900, at *10 (N.D. Cal. Oct. 13, 2015).  "While there is no Ninth Circuit bright-line rule for

13  what constitute significant elements or main duties of a job to categorize it as composite, district

14  courts generally consider the fundamental nature of the work at issue, focusing on how much time

15  a plaintiff spends doing the tasks claimed to support a composite-job finding."  *Hassan F. v.

16  O'Malley*, No. 23-cv-03553-RFL, 2024 WL 2952550, at *1 (N.D. Cal. June 5, 2024) (quoting

17  *McCullough v. O'Malley*, No. 23-cv-00298 JMS-KJM, 2024 WL 1209479, at *7 (D. Haw. Mar.

18  21, 2024)).  An ALJ may not classify an occupation 'according to the least demanding function.'"

19  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1166 (9th Cir. 2008) (quoting *Valencia v.

20  Heckler*, 751 F.2d 1082, 1086 (9th Cir.1985)).

21          Here, the ALJ found that K.G. could perform past relevant work as a nursery school

22  attendant[9] as it was "actually" performed and as "generally" performed, which he further indicated

23

24  theaters, department stores, hotels, and similar organizations: Helps children remove outer
    garments. Organizes and participates in games, reads to children, and teaches them simple
25  painting, drawing, handwork, songs, and similar activities. Directs children in eating, resting, and
    toileting. Helps children develop habits of caring for own clothing and picking up and putting
26  away toys and books. Maintains discipline. May serve meals and refreshments to children and
    regulate rest periods. May assist in preparing food and cleaning quarters."  *See* Dkt. No. 11 at 23.

27  [9] In his opinion, the ALJ incorrectly referenced DOT 359.671-016 as the citation for nursery
28  school attendant, rather than DOT 359.677-018 as cited by the vocational expert at the hearing.
    *See* AR 46, 110.

1 required "light" exertion.  AR 110.

2       K.G. argues that her prior job was "likely" composite because it involved additional duties,

3 such as "working with infants, changing diapers, or lifting up to 50 lbs," that are not among the

4 listed duties for nursery school attendant in the DOT.  Dkt. No. 11 at 22; *see* AR 27, 299.  The

5 vocational expert acknowledged that the description of nursery school attendant in the DOT did

6 not fully match K.G.'s description of her prior job, and he testified that she would not have been

7 able to perform her prior job as she described it, which required medium exertion.  *See* AR 46, 47

8 (VE: "Wait a minute, Your Honor.  I said yes, but as in the DOT only, not as she did it." ALJ:

9 "Oh, per DOT, but not as described? Okay." VE: "Correct.").  However, the vocational expert did

10 not testify that K.G.'s prior job was a composite job, nor did K.G. raise that issue during the

11 hearing.

12       K.G. does not identify what other occupation or occupations she contends form a

13 "composite" position with the DOT nursery school attendant occupation.  While she claims that

14 lifting children was part of her prior job as actually performed, she does not contend that this duty

15 was her primary duty, or that the other duties described in the classification for the nursery school

16 attendant occupation were not among the duties she performed.  In sum, K.G. has not shown that

17 her past relevant work was a composite position and that the ALJ erred in adopting the vocational

18 expert's classification of her prior work as a nursery school attendant.

19       The Court therefore grants the Commissioner's cross-motion and affirms the ALJ's

20 classification of K.G.'s past relevant work.  K.G.'s request for relief as to this issue is denied.

21       **E.       Determination of RFC**

22       K.G. asserts that the ALJ erred by failing to incorporate limitations concerning her

23 "cervical spine, right and left shoulders, and mental impairments" into his determination of her

24 RFC.  Dkt. No. 11 at 23.  The Commissioner argues that the ALJ properly took into account all of

25 the limitations for which he found record support.  Dkt. No. 13 at 10.

26       In assessing a claimant's RFC, an ALJ must consider all of the claimant's impairments,

27 including those that are not severe.  *See* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your

28 medically determinable impairments of which we are aware, including your medically

United States District Court
Northern District of California

determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity."); *see also* SSR 96-8p, 1996 WL 374184 at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'").  "While these regulations require the ALJ to *consider* the effect of all plaintiff's impairments in formulating the RFC, they do not require him to translate every non-severe impairment into a functional limitation in the RFC."  *Rania v. Kijakazi*, No. 2:20-cv-01541 MCE CKD (SS), 2021 WL 5771663, at *3 (E.D. Cal. Dec. 6, 2021), *report and recommendation adopted*, 2022 WL 95228 (E.D. Cal. Jan. 7, 2022) (emphasis in original).  "Social Security regulations define residual functional capacity as the 'maximum degree to which the individual retains the capacity for *sustained* performance of the physical-mental requirements of jobs.'"  *Reddick*, 157 F.3d at 724 (citation omitted) (emphasis in original).

Because the ALJ improperly discounted K.G.'s subjective testimony regarding her physical limitations due to pain and failed to consider her bereavement disorder diagnosis, the ALJ determined K.G.'s RFC based on an erroneous and/or incomplete assessment of her relevant impairments and limitations.  For this reason, the ALJ's RFC assessment is not supported by substantial evidence.

The Court thus grants K.G.'s request for relief as to the ALJ's assessment of her RFC, and denies the Commissioner's cross-motion as to this issue.

## IV.   DISPOSITION

K.G. asks the Court to remand for payment of benefits, arguing that this case falls within the "credit-as-true standard."  *See* Dkt. No. 11 at 24.  "An automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule."  *Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017).  The Court may remand for an immediate award of benefits under the credit-as-true standard only where (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.  *Garrison*, 759 F.3d at 1020.  Even when all

United States District Court
Northern District of California

three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings, when the record as a whole creates serious doubt as to disability. *Id* at 1021.

Here, the credit-as-true standard is not satisfied. A final determination regarding K.G.'s entitlement to benefits cannot be made absent a proper assessment of K.G.'s physical and mental impairments, including an assessment of K.G.'s subjective statements and testimony. As discussed above, on remand the ALJ should reconsider (1) K.G.'s testimony regarding her pain symptoms and her physical limitations, (2) her bereavement disorder diagnosis, and (3) reassess K.G.'s RFC and her ability to perform past relevant work.

## V.    CONCLUSION

Based on the foregoing, K.G.'s request for relief is granted in part and denied in part, and the Commissioner's cross-motion is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order.

The Clerk shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: September 30, 2024

Virginia K. DeMarchi
United States Magistrate Judge